UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


CIVIL ACTION NO. 11-11739-RWZ


BRENDA M. DIGGS

v.

PARTNERS HEALTHCARE SYSTEM, INC. and
MASSACHUSETTS GENERAL HOSPITAL

MEMORANDUM OF DECISION

June 21, 2013


ZOBEL, D.J.

Plaintiff Brenda M. Diggs, proceeding pro se, brought this suit against

defendants Partners Healthcare System, Inc. ("Partners Healthcare") and

Massachusetts General Hospital ("MGH") for alleged harassment and retaliation in her

workplace. On April 17, 2013, Diggs failed to appear for a scheduled hearing on

defendants' summary judgment motion. I therefore dismissed her case. On April 25,

Diggs moved for reconsideration of that dismissal. Although she cites no law in her

motion, I consider it a motion to alter, amend, or vacate the judgment under Federal

Rules of Civil Procedure 59(e) and 60(b). See McKenna v. Wells Fargo Bank, 693 F.3d

207, 211 (1st Cir. 2012). Reviewing my previous order, I am persuaded that dismissal

was unduly harsh. See Crossman v. Raytheon Long Term Disability Plan, 316 F.3d 36

(1st Cir. 2002). I therefore vacate the dismissal, and proceed to consider defendants'

motion for summary judgment.

## I.      Legal Standard

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The movant bears the initial burden of explaining the basis for its motion and pointing out the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To defeat summary judgment, the nonmovant must then advance evidence showing that material facts remain in dispute. In particular, the nonmovant must produce admissible evidence supporting the existence of all the essential elements on which she will bear the burden of proof at trial. Id. at 322-23. The court must view the record in the light most favorable to the nonmovant and draw all justifiable inferences in her favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). If the evidence presented would allow a reasonable jury to return a verdict for the nonmovant, summary judgment must be denied. Id. at 248.

## II.     Record Evidence

As the plaintiff, Diggs would bear the initial burden of proof at trial on all the essential elements of her claims. She must therefore adduce some admissible evidence as to each element of her claims in order to defeat defendants' summary judgment motion. See Henry v. United Bank, 686 F.3d 50, 54 (1st Cir. 2012).

At this point, it does not appear that Diggs has presented any admissible evidence to support her claims. She states the basic facts of her case in her complaint and in her response to defendants' motion for summary judgment; but neither of these submissions is an affidavit or declaration made under penalty of perjury. See 28 U.S.C.

§ 1746 (allowing declarations made under penalty of perjury to serve as evidence); Fed. R. Civ. P. 56(c)(4); Rios-Jimenez v. Principi, 520 F.3d 31, 42 n.7 (1st Cir. 2008) (conclusory allegations in an unsworn statement are not sufficient to defeat summary judgment). While Diggs has submitted a number of documents as exhibits to her pleadings, she has not authenticated any of those documents or explained why they should be considered self-authenticating. See Fed. R. Civ. P. 901, 902; Carmona v. Toledo, 215 F.3d 124, 131 (1st Cir. 2000). Diggs's failure to produce admissible evidence is itself a sufficient reason to grant summary judgment for defendants. Nevertheless, in an abundance of caution and in recognition of Diggs's pro se status, I will extend her filings the credence normally reserved for admissible evidence. I will therefore consider the factual allegations in her complaint and in her response to defendants' motion as if they were made under penalty of perjury. I will likewise consider the exhibits she has submitted as if they were properly authenticated. But even with that extraordinary leeway, Diggs has failed to present any case that can survive summary judgment.[1]

## III.  Background

MGH hired Diggs in August 2009 for a temporary position as a staff assistant in the MGH Center for Child & Adolescent Health Research and Policy ("the Center").[2]

---

[1] Defendants apparently take the same approach. Their motion for summary judgment does not specifically challenge the admissibility of the statements or documents that Diggs has presented, and they adopt many of Diggs's allegations in their statement of undisputed facts. I note that defendants also have not authenticated by affidavit the exhibits they submit. See Carmona, 215 F.3d at 131.

[2] At the time, the Center was known as the "Center for Child & Adolescent Health Policy"; the word "Research" was added later.

About four months later, MGH gave Diggs a permanent staff assistant position. Her duties were primarily to provide administrative assistance to two researchers at the center, James Perrin and Jonathan Winickoff. Perrin was the overall director of the Center.

On one occasion in April 2010, as Perrin and Diggs were walking through an office doorway on their way to a meeting, he rubbed her in the middle of her back. Diggs characterizes the contact as sexual or sensual. She asked him not to touch her like that again, at which point he apparently "appear[ed] offended and rejected." Docket # 48 (Opp.) at 4. After that incident, Perrin took a project that he had previously assigned to Diggs—preparing for an office move—and assigned it to a different staff assistant.

Over time, Diggs began to have increasing difficulty in her work environment. Although she was originally expected to split her time evenly between work for Perrin and Winickoff, she found that Perrin gave her so much work that it took up three quarters of her time. The situation was exacerbated when the Center eliminated its office manager position, adding further administrative tasks to Diggs's responsibilities.

At least once in May 2010, Perrin observed Diggs staying late to finish her work and then arriving late the following day. He informed her that she was expected to complete all her work during the regular work day, and was not allowed to stay late and then arrive late. Diggs claims that Perrin did not enforce that policy against any other employees at the Center. Diggs also felt that Perrin was rude to her and to other employees, creating a work environment that she described in May 2010 to a human

resources representative as "very uncomfortable, unhealthy and actually . . . almost toxic." Docket #46, Ex. 7.[3]

In June 2010, Peter Lam began supervising Diggs.[4] He apparently instructed her to "write down . . . all [her] tasks to the minute and give [her] reports to [him]." Docket # 1 (Compl.) ¶ 3. Lam and Perrin together "gradually took most of [her] work away and gave it to [a temporary staff assistant]." Id. As the situation deteriorated, Lam and Diggs met with an MGH human resources generalist, Michael Irgens; Lam told Irgens at that point there was no problem with Diggs's work. Irgens promised to look into the complaints Diggs raised.

In a subsequent meeting in July 2010, Diggs informed Irgens that Perrin had touched her back inappropriately in April. Irgens asked why she had waited so long to report the incident; Diggs responded that she was afraid of retaliation.

The fall brought more conflict between Lam and Diggs. At one point Lam made several comments to Diggs that she considered offensive, such as pressing her about her nationality and implying in a disparaging manner that she relied on food stamps.[5] On another occasion, Lam accused Diggs of entering her hours incorrectly on her timesheet. Diggs provided a correct timesheet, vindicating herself; she then reported

---

[3] As further evidence on this point, Diggs has submitted an email she sent to a coworker with the subject line "Hostile environment?" The coworker responded "Yes! Too much tension, too much unnecessary drama." Compl., Ex. F. Diggs has also submitted email chains showing that another supervisor had concerns about Perrin's leadership, id., Ex. W, and about his rudeness towards Diggs, id., Ex. B.

[4] Diggs states in her complaint that Lam was "instructed by . . . Perrin to harass and abuse [her]." Docket # 1 (Compl.) ¶ 3. She does not indicate how this statement could possibly be made on personal knowledge, and so I do not consider it admissible. Fed. R. Civ. P. 56(c)(4).

[5] Diggs's opposition to defendants' summary judgment motion explicitly abandons any claim of racial harassment. Opp. at 3.

the situation to the human resources department, which informed her that Lam had made a mistake. Nevertheless, Lam began requiring her to email him when she arrived for work, left for lunch, returned from lunch, and left for the day. Docket # 46, Ex. 14. He also told her she could not leave her desk at other times unless she called someone to sit in her position. Compl. ¶ 7.

Diggs also observed Perrin behaving oddly towards her. According to Diggs, Perrin "started coming out of his office, stand[ing] in front [of] my desk[,] and pretend[ing] to put paper into the recycle bin." Compl. ¶ 11. He would simultaneously "glar[e]" at Diggs, making her feel "very uncomfortable, intimidated and unsafe." Id. When Diggs asked him if he had any work for her, he sometimes would not respond. Id.

Meanwhile, Diggs began receiving negative evaluations of her performance at work. In August 2010, Lam spoke with Diggs about several areas in which he believed she needed to improve, including "[r]olling eyes" and "[b]eing less combative and giving more constructive criticism. Docket # 46, Ex. 11. Diggs denied any inappropriate behavior. Opp. at 6-7. On September 13, Debra Armstrong, another manager at the Center, emailed Diggs observing that she had worked from noon until 6:15pm one evening without taking a lunch break. Id., Ex. 12. She informed Diggs that working through lunch was not permitted without pre-approval. The incident triggered further conversations among Diggs, Lam, and Irgens.

At around this time, Diggs met with Irgens and Patricia Sheehan, another human resources officer. Sheehan offered Diggs a severance package to voluntarily resign from her job. Although Diggs had previously sought to transfer into another department,

she declined to voluntarily resign her job because she felt it would be surrendering to retaliation. Opp. at 5.

Diggs received her first annual performance review on October 28, 2010. That review was signed by Perrin, Winickoff, and Lam. It gave Diggs a rating of 2 (on a scale from 1 to 5), which meant "Needs Improvement." Id., Ex. 15, at PHS 1519. It noted a number of failures on her part, including: difficulty in learning new tasks, difficulty with advanced use of Microsoft Excel, tardiness, inconsistent communication about work absences, difficulty with teamwork and interpersonal skills, difficulty meeting deadines and completing work accurately, and problems with properly documenting her completed tasks. Diggs refused to sign the performance review; she insists that "nothing on it was true." Compl. ¶ 13. Based on the negative review, Diggs was placed on a "Work Action Plan" to improve her performance. Docket # 46, Ex. 16. That plan involved specific performance goals and increased monitoring of her duties.

In late 2010, Lam resigned from the Center and Alixandra Knapp became Diggs's supervisor. Knapp continued working with Diggs under the Work Action Plan.

On December 2, 2010, Knapp gave Diggs an oral warning instructing her to accomplish her tasks on time and correctly. Id., Ex. 20. It additionally asked her to "uphold professional and ethical standards, and . . . not call people names or insult others in the department." Id. The warning was apparently triggered by Diggs's failure to enter a lunch order correctly. On the same day, Diggs separately received a positive review by an administrative manager outside her department whom she was temporarily assisting. The manager was "extremely grateful" and described Diggs as a

"terrific help." Compl., Ex. O. Although that review was sent to Perrin, Winickoff, and Knapp, none of them mentioned it to Diggs.

On January 4, 2011, Knapp issued Diggs a written warning for ongoing deficiencies in her work performance. The warning specifically noted that Diggs had been assigned to enter staff timesheets, update and replace staff nameplates, and update the staff telephone directory; Diggs had entered two timesheets incorrectly, and had erred on either the nameplate or the directory entry for eleven of the twenty-three staff members. In addition, she had required more time than expected to complete these tasks, and had stayed half an hour past her normal departure time despite receiving help from an intern. Docket # 46, Ex. 21. Diggs does not contest the accuracy of the facts stated in the written warning.

A few weeks later, Knapp issued Diggs a final written warning for failing to complete four administrative tasks. The warning explains that Knapp instructed Diggs in detail on how to perform each task; it then provides specific examples of how Diggs failed to follow her instructions or complete the tasks in a timely fashion. Docket # 46, Ex. 22. Again, Diggs does not contest the accuracy of the facts stated in the warning.

The situation did not improve. On January 28, 2011, Knapp emailed Irgens and Sheehan with another detailed list of Diggs's deficiencies. Summarizing the issues, Knapp stated: "Since [Diggs's] final written warning last Friday . . . there is no change in her work performance and it remains substandard, if not worse. . . . I now again strongly feel these continued performance deficiencies in a multitude of areas warrant further corrective action." Id., Ex. 23.

8

On January 31, 2011, Diggs sent a letter to the American Civil Liberties Union of Massachusetts ("ACLU") complaining about her work situation.[6] She copied the president of MGH, the chairman of the board of MGH, and the chief executive officer of Partners Healthcare. In that letter, she stated that she had "experienc[ed] severe abuse and harassment" since she began work at MGH. Compl., Ex. P. She obliquely mentioned the back-touching incident, and also noted the staring incidents.

On February 3, 2011, Sheehan wrote Diggs a letter acknowledging receipt of a copy of Diggs's letter to the ACLU. Sheehan noted that MGH had investigated Diggs's complaints and found no evidence to support them; she also mentioned that MGH had "significant concerns regarding [Diggs's] work performance," and that any further failure by Diggs to live up to performance expectations would "result in further corrective action, up to and including termination from employment." Compl., Ex. S.

The next day, Knapp met with Diggs for a scheduled work conference. According to Knapp, Diggs made the following statements during that conference:

- "If I am getting fired here, I am not going out alone. Because people need to be held accountable for what they do. And the way I'm being treated. That's not right."
- "If I get fired it's blood on your hands not mine. Karma, you know? It's all about karma. Seriously, if I'm fired, blood on their hands, not mine. I'm not trying to be threatening or hostile, I'm just saying, it's all about karma."

Docket # 46, Ex. 25. Diggs insists that she never made any threatening statements. Opp. at 8.

---

[6] The letter is dated January 3, but the complaint states that it was delivered on January 31. Compl. ¶ 14.

After the meeting, Knapp contacted Irgens and told him that Diggs's statements had made her feel uncomfortable. Irgens discussed the matter with Sheehan, and they agreed that Diggs should be dismissed immediately. Knapp and Irgens therefore met with Diggs that afternoon and informed her that she was being placed on disciplinary leave, and was no longer permitted on MGH property. She was then escorted out of the building.

Diggs received two voicemails from Knapp a few days later, both asking her to call and schedule another meeting. Rather than responding to Knapp by phone, Diggs emailed Irgens to schedule the meeting, because she worried that Knapp might misrepresent her words.

The meeting was eventually scheduled for February 10. At that meeting, Diggs was formally terminated. She notes that MGH did not afford her a pretermination hearing, or any other specific opportunity to respond to Knapp's report about the allegedly intimidating comments.

Diggs subsequently filed a complaint with the Equal Employment Opportunity Commission ("EEOC") charging MGH with harassment and retaliation. The EEOC issued a right-to-sue letter in July 2011; Diggs then commenced this action in September 2011. She claims that she suffered and continues to suffer financial difficulties, physical distress, and emotional distress caused by defendants' conduct.

## IV.   Analysis

Diggs's complaint is not divided into separate counts, and it does not cite any law as the basis for her claims. Construing her pro se pleading generously, I believe it

seeks to assert liability under state and federal law for sexual harassment and retaliation.[7]

### A.    Sexual Harassment

Under Title VII of the Civil Rights Act of 1964, an employer may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. 2000e-2(a)(1). Massachusetts has enacted a similar requirement in Mass. Gen. Laws ch. 151B, § 4(1). These statutes forbid sex discrimination in the workplace, including sexual harassment that creates a hostile work environment. Medina-Rivera v. MVM, Inc., 713 F.3d 132, 137 (1st Cir. 2013); see also Mass. Gen. Laws ch. 151B, § 4(16A). To show a hostile work environment, the plaintiff must demonstrate that the sexual harassment she suffered at work was "severe or pervasive." Burlington Indus. v. Ellerth, 524 U.S. 742, 754 (1998); see also Pelletier v. Town of Somerset, 939 N.E.2d 717, 731 n.32 (Mass. 2010). Here, the only sexual harassment that Diggs claims is that Perrin once touched her back in a sexual or sensual fashion. As a matter of both state and federal law, that unwanted touching is not sufficiently severe or pervasive to sustain a hostile work environment claim. See Faragher v. City of Boca Raton, 524 U.S. 775, 787-88 (noting that "isolated incidents" will not create a hostile environment unless "extremely serious"); Pomales v.

---

[7] Defendants' motion likewise construes the complaint as raising sexual harassment and retaliation claims, and Diggs does not dispute that interpretation in her opposition. Defendants additionally address a putative race-based hostile work environment claim; however, Diggs has specifically disclaimed any such basis for liability. See Opp. at 3 ("[P]laintiff has never tried to make this a racial case.").

Celulares Telefonica, Inc., 447 F.3d 79, 83-84 (1st Cir. 2006) (single incident in which a

supervisor grabbed his own groin and made a sexually suggestive comment was

insufficient to establish a hostile environment claim); Muzzy v. Cahillane Motors, Inc.,

749 N.E.2d 691, 695 (Mass. 2001) (same standard for hostile environment claims

under federal law and Massachusetts law).[8]

  Title VII and Chapter 151B also prohibit "quid pro quo" sexual harassment,

which occurs when "a supervisor uses his superior position to extract sexual favors

from a subordinate and, if rebuffed, retaliates by taking action that adversely impacts

the subordinate's employment." Gerald v. Univ. of P.R., 707 F.3d 7, 20 (1st Cir. 2013);

see also Mass. Gen. Laws ch. 151B, § 1(18)(a). Diggs apparently believes that Perrin

retaliated against her when she rejected his sexual advances (i.e., when she asked him

nicely not to touch her back again). But she has presented no evidence of causation:

that is, she has failed to show she was persecuted because she rejected Perrin. See

Papelino v. Albany Coll. of Pharmacy of Union Univ., 633 F.3d 81, 89 (2d Cir. 2011)

(noting causation requirement for Title IX and Title VII quid pro quo cases).

  Diggs does not claim Perrin explicitly or implicitly threatened to exact retribution

for the alleged rebuff, which seriously undermines her claim that his subsequent

actions were quid pro quo harassment. A supervisor's attempt to extract sexual favors

need not be explicit, see Gerald, 707 F.3d at 21; but there should be at least some

substantial indication that the supervisor is seeking sexual interaction. In this case, it is

---

[8]Nor is the hostile work environment claim saved by Diggs's additional assertion that Perrin unnecessarily stared at her on several occasions. The staring appears to have been vindictive in character, not sensual. See Compl. ¶ 11 (alleging Perrin "glar[ed]" at Diggs).

hard to see Perrin's actions as punishing Diggs for refusing to suffer his advances.[9]

Diggs likewise has not provided any evidence that Perrin told Winickoff, Irgens, Sheehan, Armstrong, or Knapp to punish her for rejecting his advances (or for any other reason). Diggs does assert that Perrin instructed Lam to "harass and abuse" her, Compl. ¶ 3; but she presents no evidence behind that statement, and apparently lacks personal knowledge to support it. See Fed. R. Civ. P. 56(c)(4); Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) ("Conclusions that rest wholly on speculation are insufficient to defeat a motion for summary judgment."). As such, there is no evidence that the various actions by these individuals—the close supervision by Lam, the negative performance review signed by Lam and Winickoff,  the email from Armstrong about working overtime, the oral and written warnings by Knapp, the disciplinary suspension by Irgens and Sheehan, etc.—were part of any larger quid pro quo harassment by Perrin. In sum, there is no evidence from which a reasonable jury could conclude Diggs suffered because she rejected Perrin's advances, rather than because she had independent difficulties with her work and her coworkers.

The comparison between this case and Gerald is instructive. In Gerald, the plaintiff had a brief affair with her supervisor; when he attempted to pursue the relationship further, she rebuffed him. 707 F.3d at 12. She was subsequently demoted.

---

[9] Indeed, it is somewhat hard to make sense at all of Diggs's assertions about Perrin's conduct. As to her workload, Diggs claims that Perrin harassed her by taking one project away from her; then that he harassed her by giving her more work than she could do; and then that he and Lam harassed her by taking away all her work completely. Apparently she believes his retaliatory strategy changed over time. As to Perrin's personal behavior, she claims that he was rude to her; but she also claims he was rude to other employees, undercutting the idea that his rudeness constituted quid pro quo harassment. Finally, she claims that Perrin required her to complete all her work during the workday, and stared at her. These assertions simply do not raise a reasonable inference of quid pro quo harassment.

13

Suing, she claimed the demotion was quid pro quo harassment; the defendant employer responded the demotion simply reflected her "non-compliance with her job responsibilities and insubordinate attitude." Id. at 20. The district court granted summary judgment for the defendant, but the First Circuit reversed. It noted two pieces of evidence in the record that together created a triable issue of fact on the plaintiff's quid pro quo harassment claim. First, the plaintiff's supervisor had sent her several ambiguous emails that could be read as sexually propositioning her or threatening retaliation. Id. at 21. The court found it was "plausible" to read sexual innuendo into those emails, although it "acknowledge[d]" it was "getting close to speculative territory." Id. It then held that the emails alone "would likely not be enough to create a trial-worthy issue." Id.  But the plaintiff in that case also presented "a good amount of evidence rebutting the [defendant's] contention that she was demoted for job related reasons," by showing that her performance at her job was not as bad as the defendant claimed. Id. at 21-24. Taken together, the ambiguous emails and the evidence of good performance were enough to present a triable case of quid pro quo harassment. Id. at 23-24.

Here, Diggs has neither of the two types of evidence that the plaintiff in Gerald advanced. She does not indicate that Perrin even ambiguously propositioned her or threatened retaliation after the allegedly sensual back-touching. Perhaps more important, she has not genuinely disputed the repeated instances of poor work performance recorded in her performance review, oral warning, written warning, and final written warning. Nor has she contested the "continued performance deficiencies in a multitude of areas" catalogued by Knapp in her January 28, 2011 email to Irgens and

14

Sheehan. Docket # 46, Ex. 23. To the extent Diggs does dispute her supervisors'
evaluations, she relies almost entirely on conclusory assertions. See, e.g., Compl. ¶ 13
(insisting that "nothing on [the performance review] was true"). The only outside
evidence Diggs presents to show good performance is a single comment by Lam in
June 2010 that there was no problem with her work, and a single positive email in
December 2010 from another supervisor in a different department. Considering this
record as a whole, Diggs has not raised a reasonable inference that her difficulties at
work were caused by quid pro quo sexual harassment rather than by poor performance.

### B.   Retaliation

Title VII and Chapter 151B prohibit not only sexual harassment, but also
retaliation for complaining about incidents of sexual harassment. To make out a
retaliation claim under either statute, "a plaintiff must show that (i) she undertook
protected conduct; (ii) she suffered an adverse employment action; and (iii) the two
were causally linked." Noviello v. City of Boston, 398 F.3d 76, 88 (1st Cir. 2005). If the
plaintiff makes out a prima facie case of retaliation, the burden shifts to the defendant
to explain its employment decision; if the defendant can articulate a legitimate, non-
retaliatory reason for its decision, then the burden shifts back to the plaintiff to show
pretext. Gerald, 707 F.3d at 24.

Diggs claims that she was retaliated against for reporting the back-touching
incident to Irgens in July 2010; she may also be claiming that she was retaliated
against for reporting the staring incident to the MGH human resources department, and
for writing her letter to the ACLU. As above, these claims fail because Diggs has not

15

presented evidence raising a reasonable inference of causation.[10]

Broadly speaking, Diggs states that she was retaliated against in two ways: by harassment at work (increased supervision, false accusations by Lam, etc.), and by her eventual termination. See Jones v. Walgreen Co., 679 F.3d 9, 20-21 (1st Cir. 2012) (retaliatory termination); Noviello, 398 F.3d at 88-94 (retaliatory hostile work environment). As to the retaliatory workplace harassment claim, Diggs has failed to raise a reasonable inference that any of the obstacles she faced were in fact retaliation for her reports about Perrin's conduct. Indeed, it is not clear whether any of her supervisors—including Perrin himself—even knew she had complained to Irgens about the back-touching incident. On the present record, it would be pure speculation to suggest that the friction between Diggs and her supervisors was caused by retaliation.[11] Moreover, much of the harassment about which Diggs complains occurred before she first reported Perrin's behavior. Those earlier incidents could not be caused by Diggs's later protected conduct. See Trainor v. HEI Hospitality, LLC, 699 F.3d 19, 27 (1st Cir. 2012); Mole v. Univ. of Mass., 814 N.E.2d 329, 340 (Mass. 2004). They also undercut any inference that the later incidents were caused by retaliation rather than ongoing workplace friction.

Finally, as to Diggs's termination, she has not presented any substantial

---

[10] Defendants also argue that Diggs never engaged in protected conduct, because she had no reasonable, good-faith belief that the back-touching and staring of which she complained was actually illegal. See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001). Because Diggs has failed to adduce evidence of causation, I need not address that alternative argument.

[11] Defendants also argue that the hostile incidents Diggs faced were not sufficiently severe to constitute a retaliatory hostile work environment. Cf. Noviello, 398 F.3d at 93-94 (detailing evidence of a "steady stream of abuse"). Again, because Diggs has not presented evidence sufficient to show causation, I need not consider this alternative argument either.

evidence that she was fired because of any report she made about Perrin's behavior.

There is no direct evidence that her termination was retaliatory. The seven-month delay

between her initial report about the back-touching incident (in July 2010) and her

eventual termination (in February 2011) does not raise any inference of retaliatory

animus.[12] See Clark Cnty. Sch. Dist. v. Breeden, 532 U.S. 268, 273-74 (2001)

(temporal proximity must be "very close" to show causation (quoting O'Neal v.

Ferguson Constr. Co., 237 F.3d 1248, 1253 (10th Cir. 2001)). And the extensive

evidence of Diggs's poor performance in the days leading up to her termination is more

than enough to quell any possible doubts about why she was terminated. See Soileau

v. Guilford of Me., 105 F.3d 12, 16-17 (1st Cir. 1997) (a retaliation claim fails when

"[t]he larger picture undercuts any claim of causation"). That evidence of poor

performance was assembled before Diggs sent her ACLU letter, negating any possible

claim that Diggs was terminated to punish her for that communication. See Mole, 814

N.E.2d at 339-41.

## V.    Conclusion

Diggs's motion for reconsideration (Docket # 50) is ALLOWED, and the order

dismissing this case for want of prosecution is vacated. However, defendants' motion

for summary judgment (Docket # 45) is also ALLOWED. Judgment for defendants shall

enter accordingly.

---

[12] Diggs has not presented evidence showing if or when she reported the staring incidents to MGH's human resources department, meaning she has not satisfied her burden to show any such protected conduct led to the asserted retaliation.

| June 21, 2013 | /s/Rya W. Zobel |
|---|---|
| DATE | RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE |